**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**BRENDA K. GARAY,** *et al.*,

    **Plaintiffs,**

       **v.**

**OFFICER ANDERSON LIRIANO,** *et al.*,

    **Defendants.**

Civil Action No.  11-1207 (JEB)

---

## MEMORANDUM OPINION

On April 14, 2010, Officers Anderson Liriano and Rafael Sarita of the Metropolitan

Police Department entered Plaintiff Brenda Garay's apartment in Northwest Washington without

a warrant, seeking to arrest Garay and her teenage daughter for an assault that had recently taken

place nearby.  This entry was accomplished with the assistance of the building's property

manager, Tisa Wilson, who unlocked the apartment door for the officers.  Once inside the unit,

the officers handcuffed Garay and her daughter Jennifer, whom they then escorted outside of the

building.  After being informed by an eyewitness to the assault that they had arrested the wrong

daughter, the officers removed Jennifer's handcuffs and placed them on Garay's other daughter,

Jessica Pineda.

Garay – for herself and on behalf of her daughters – has filed this suit under

42 U.S.C. § 1983, alleging that the officers violated their Fourth Amendment rights by, *inter*

*alia*, the unlawful entry, improper arrests, and use of excessive force.  They further allege a

number of common-law violations against the officers, including false arrest and imprisonment,

intentional infliction of emotional distress, trespass, and invasion of privacy.  Plaintiffs also

contend that the District of Columbia itself is liable for the officers' conduct under the theories of

both *respondeat superior* and municipal liability pursuant to <u>Monell v. Dep't of Soc. Servs. of the City of New York</u>, 436 U.S. 658 (1978).  Finally, Plaintiffs assert a number of causes of action against the building's property manager, Tisa Wilson, and its owner, Van Metre Columbia Uptown Apartments, LLC.  In an earlier decision, this Court dismissed several of the claims against these last two Defendants, leaving only two counts against them: invasion of privacy and trespass.  <u>See</u> <u>Garay v. Liriano</u>, 839 F. Supp. 2d 138 (D.D.C. 2012) (<u>Garay I</u>).

All Defendants now move for summary judgment, and Plaintiffs cross-move for partial summary judgment, limited to several aspects of their § 1983 claim against the officers.  Finding the police entry unlawful as a matter of law, the Court will grant Plaintiffs' Motion as to this segment of their § 1983 claim.  For that same reason, the Court will also grant Plaintiffs' Motion on the component of their § 1983 claim that concerns the warrantless arrests of Brenda and Jennifer Garay in their home, but grant the officers' Motion on the arrest of Jessica Pineda on the street.  Because the common-law false-arrest and false-imprisonment claims rise or fall on the legality of these arrests, the Court will grant Defendants' Motion with respect to the lawful arrest of Jessica Pineda, but deny it as to the unlawful arrests of the two Garays.  Additionally, the Court will grant Defendants' Motion regarding the excessive-force piece of Plaintiffs' § 1983 claim and their freestanding intentional-infliction-of-emotional-distress count.  The last causes of action against the officers – Plaintiffs' claims for trespass and invasion of privacy – survive.  Plaintiffs, meanwhile, concede that the District should be dismissed on all counts as a Defendant, meaning the suit proceeds just against the officers.  Finally, because the Court finds that Wilson and Van Metre are entitled to summary judgment on the only remaining claims against them, the Court will grant their Motion.

I.       **Background**

Unless otherwise noted, the facts set forth herein are undisputed and are drawn from the

parties' Statements of Undisputed Material Facts submitted pursuant to Local Civil Rule 7(h).

On April 14, 2010, Officers Sarita, Liriano, and Madeline Collado responded to an

assault that had occurred around 4:00 p.m. in the 3100 block of 14th St., Northwest.  See District

Defendants' Statement of Undisputed Material Facts (Dist. Defs.' SUMF), ¶ 1.  Arriving on the

scene, the officers encountered Jasmine Sosa, a teenage girl who had been involved in the

altercation.  See id., ¶¶ 2-4.  Sosa was bleeding from the face, and Officer Collado called for an

ambulance to treat her injuries.  See id., ¶¶ 3-6, 8.  While the officers had no reason to conclude

that a gun or knife had been used in the assault, Officer Sarita believed that some type of object

may have been employed.  See id., ¶ 4.

Plaintiff Jessica Pineda acknowledges that she was involved in the fight and that she hit

Sosa in the face with a closed fist; however, she disputes the extent of Sosa's injury and the

seriousness of the altercation.  See Plaintiffs' Response to Dist. Defs.' Summary of Undisputed

Material Facts (Pls.' Resp. to Dist. Defs.' SUMF), ¶¶ 4, 8, 9.  Plaintiffs contend that Sosa

instigated the fracas after she had followed sisters Jennifer Garay and Jessica Pineda down the

street trying to provoke them.  See Dist. Defs.' SUMF, ¶ 10.  The girls did not want to engage

Sosa and went to a nearby store to borrow a phone to call their mother, Brenda Garay.  See id., ¶

11.  After their mother told them that she would come to meet them, the two left the store and

again encountered Sosa on the street.  See id., ¶¶ 11-12.  Sosa hit Jessica, and the two continued

to tussle until Garay arrived and removed her daughter from the confrontation.  See id., ¶¶ 12-13.

Garay and her two daughters then left the scene and returned home.  See id., ¶ 13.

When the officers arrived after the altercation, Sosa's teenage friend Rosa Rivas informed them that "she observed the assault, and that she witnessed a girl and the girl's mother punching Jasmine numerous times with closed fists to Jasmine's body and grabbing Jasmine by the hair.  Ms. Rivas further stated that she knew Jasmine's attackers by name, and could take the officers to where they lived."  Id., ¶ 14 (internal citations omitted).  Minutes later, Officers Sarita and Liriano followed Rivas to find the individuals who she claimed had been involved in the fight.  See id., ¶ 15.  They arrived at Plaintiffs' apartment building, 1375 Fairmont St., NW, located several blocks from where the confrontation had occurred, and Rivas directed them to Apartment 301, where Plaintiffs lived.  See id., ¶¶ 16-17.

The officers knocked on the door to Plaintiffs' apartment, announced themselves as the police, and requested that Plaintiffs open the door.  See id., ¶ 18.  Plaintiffs aver that the "officers threatened to break down the door if it was not opened."  Id., ¶ 19.  Brenda Garay, however, did not want to open the door and believed that the officers could not enter without a warrant or a special paper.  See id., ¶ 20.  Having failed to gain invited access to the apartment, the officers went downstairs and spoke to the building's property manager, Tisa Wilson.  See id., ¶ 21.  According to Wilson, they told her that they needed to get into Apartment 301 because "a serious crime had been committed, that Brenda Garay was involved, and that they needed her to open the door to the apartment or they would break it down."  See id., ¶ 21 (internal citations omitted).  Wilson told them that she normally would not open the door to an apartment in the building without a warrant, but the officers persisted in explaining the situation, leading Wilson to believe "that it involved a bad situation where someone was badly hurt."  Id., ¶ 22.

Wilson took the key to Plaintiffs' apartment and unlocked the door for the officers to enter.  See id., ¶¶ 23-24.  Once in the apartment, the officers informed Plaintiffs that they were

there with respect to the assault that had occurred on 14th Street.  See id., ¶ 25.  They remained

for several minutes before handcuffing Garay and Jennifer.  See id.  Garay contends that during

her encounter with the officers, they

> grabbed her on both her arms in the area between her elbow and
> shoulder.  Exh. 6 (B. Garay Dep. at 48-49).  Plaintiff Jessica
> Pineda said she observed the officers grab her mother roughly but
> only to handcuff her.  Exh. 4 (J. Pineda Dep. at 125-126).  Plaintiff
> Brenda Garay stated that she sustained bruises to her wrist, both
> arms, an elbow, and a scrape on her foot as a result of the force
> used by the officers during the arrest.  Exh. 6 (B. Garay Dep. at 69-
> 70).

Id., ¶ 27.  The officers then escorted Garay and Jennifer out of the building and onto the street.

See id., ¶ 28.

Rivas thereupon advised the officers that they had arrested the wrong sister, as it was

Jessica – and not Jennifer – who had been involved in the fight.  See id.  The officers corrected

this mistake by removing the handcuffs from Jennifer and placing them on Jessica.  See id., ¶ 29.

Garay was taken to the Third District station for processing and was released about one hour

later.  See id., ¶ 31.  Jessica, meanwhile, was taken in for juvenile processing and released

approximately two hours later.  See id., ¶ 32.  Garay was charged with simple assault and was

ultimately acquitted at a bench trial.  See id., ¶ 33.  There is no evidence that any charges against

Jessica were ever brought.

As a result of the events that transpired on April 14, 2010,

> Jennifer Garay testified that the incident made her sad and mad and
> angry.  She further testified that she cried twice about the incident,
> and she felt angry when she saw the officers after the incident.
> Jennifer Garay further stated that she had trouble sleeping and felt
> nervous, but that she always had trouble sleeping and she always
> gets nervous about things in general.

Id., ¶ 34 (internal citations omitted).  Additionally, her sister Jessica "testified that she was anxious and depressed after the incident"; however, she "did not talk to any doctors or counselors or anyone at school about the incident, and did not miss any school due to the incident." Id., ¶ 35.  Garay "described the incident as a 'nightmare' that she could not forget, and suffered mental injuries"; like her daughter, "she did not see a therapist or any other professional regarding any mental distress she felt." Id., ¶ 36.

On April 13, 2011, all three Plaintiffs filed a Complaint in the Superior Court for the District of Columbia, asserting a number of causes of action relating to their arrests.  See ECF No. 1 (Notice of Removal; Original Complaint).  The case was removed to this Court in June 2011.  See id.  Following removal and the amendment of pleadings, Plaintiffs' Third Amended Complaint contained the following counts:

- § 1983 claim for Fourth Amendment violations against the officers (Count I) for:

    - Unlawful entry;
    - Unlawful arrest;
    - Excessive force;
    - Searching Plaintiffs' home without probable cause; and
    - Preparing false and/or incomplete police reports.

- § 1983 claim against the District under Monell for failure to train (Count I);

- § 1983 claim against Wilson for the unreasonable search and seizure (Count I);

- False Arrest and Imprisonment (Counts II & III) against the officers and the District;

- Intentional Infliction of Emotional Distress (Count IV) against the officers, the District, Wilson, and Van Metre;

- Malicious Prosecution (Count V)  against the officers and the District;

- *Respondeat Superior* Liability (Count VI) against the District and Van Metre;

- Invasion of Privacy (Count VII) against the officers, the District, Wilson, and Van Metre; and

- Trespass (Count VIII) <u>against the officers, the District, Wilson, and Van Metre</u>.

<u>See</u> <u>id.</u>, ¶¶ 29-46.

On October 28, 2011, Wilson and Van Metre moved to dismiss the entire case against

them.  <u>See</u> ECF No. 43.  This motion was granted in part and denied in part on March 16, 2012.

<u>See</u> <u>Garay I</u>, 839 F. Supp. 2d at 144.  Specifically, the Court dismissed the § 1983 claim against

Wilson and the IIED claim against both Wilson and Van Metre, but allowed the invasion-of-

privacy and trespass claims to proceed.  <u>See</u> <u>id.</u>  Following a period of discovery, the parties

have now filed various motions for full or partial summary judgment.

## II.      Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P.

56(a); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986); <u>Holcomb v.</u>

<u>Powell</u>, 433 F.3d 889, 895 (D.C. Cir. 2006).  "A party asserting that a fact cannot be or is

genuinely disputed must support the assertion by citing to particular parts of materials in the

record."  Fed R. Civ. P. 56(c)(1)(A).  "A fact is 'material' if a dispute over it might affect the

outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do

not affect the summary judgment determination."  <u>Holcomb</u>, 433 F.3d at 895 (quoting <u>Liberty</u>

<u>Lobby, Inc.</u>, 477 U.S. at 248).  "An issue is 'genuine' if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  <u>Id.</u>  The party seeking summary judgment

"bears the heavy burden of establishing that the merits of his case are so clear that expedited

action is justified."  <u>Taxpayers Watchdog, Inc., v. Stanley</u>, 819 F.2d 294, 297 (D.C. Cir. 1987).

"Until the movant has met its burden, the opponent of a summary judgment motion is under no

obligation to present any evidence." Gray v. Greyhound Lines, East, 545 F.2d 169, 174 (D.C. Cir. 1976).

When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, Inc., 477 U.S. at 255; see also Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc); Wash. Post Co. v. United States Dep't of Health and Human Servs., 865 F.2d 320, 325 (D.C. Cir. 1989). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor. Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the nonmovant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Liberty Lobby, Inc., 477 U.S. at 249-50.

**III.   Analysis**

The District Defendants – *i.e.*, the District itself and Officers Liriano and Sarita – jointly move for summary judgment on almost all of the claims against them. Plaintiffs, meanwhile, cross-move for partial summary judgment against the officers on certain segments of their § 1983 claim. Since these two Motions have several issues in common, the Court will address

them together.  Thereafter it will consider the distinct issues raised by Van Metre and Wilson's Motion for Summary Judgment on the two counts remaining against them.

   A.  <u>Cross-Motions of Plaintiffs and District Defendants</u>

   Before proceeding to the analysis, the Court will briefly dispense with a couple of undisputed preliminary issues.  First, the District Defendants move for summary judgment on all but two sub-counts: Plaintiffs' § 1983 claim regarding the search of their home without probable cause (Count I(d)) and their § 1983 claim regarding the preparation of false and/or incomplete police reports, declarations, and affidavits (Count I(e)).  Because these claims have not been challenged, they survive Defendants' Motion.  Second, as Plaintiffs expressly concede a number of claims in their Opposition, the Court will dismiss these counts without further discussion. These include: the malicious-prosecution claim against all Defendants (Count V), the <u>Monell</u> claim against the District (in Count I), and all tort claims against the District (in Counts II, III, IV, VII & VIII).  <u>See</u> Pls.' Am. Opp. to Dist. Mot. at 16.  Because no causes of action now remain against the District, it is dismissed as a Defendant, and the Court will analyze these Cross-Motions only as they pertain to the officers in their individual capacities.

   The Court will begin with Plaintiffs' § 1983 claim and then move on to separate analyses of each common-law claim.

   *1.     § 1983*

42 U.S.C. § 1983 provides for a cause of action against

> [e]very person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws . . . .

Id.  A plaintiff asserting civil rights violations under Section 1983 must establish that the

defendant acted under color of state law to cause a deprivation of a right secured by the United

States Constitution or the laws of the United States.  See West v. Atkins, 487 U.S. 42, 48 (1988).

There is no question that the officers were acting under color of D.C. law at the time of the

incident, so the dispute focuses on whether the officers violated Plaintiffs' Fourth Amendment

rights through an improper entry, false arrest, or use of excessive force.  The Court will consider

the Cross-Motions on each of these three topics separately, incorporating where appropriate the

officers' reliance on the doctrine of qualified immunity.

a.      Entry

"[T]he physical entry of the home [] is the chief evil against which the [Fourth]

Amendment is directed."  Washington v. Chrisman, 455 U.S. 1, 13-14 (1982) (internal citations

omitted).  "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a

home without a warrant are presumptively unreasonable."  Payton v. New York, 445 U.S. 573,

586 (1980).  As the Supreme Court noted in Payton, "[T]he Fourth Amendment has drawn a firm

line at the entrance to the house.  Absent exigent circumstances, that threshold may not

reasonably be crossed without a warrant."  Id. at 590.  Describing the significance of the warrant

requirement in the search context, the Supreme Court has explained,

> We are not dealing with formalities.  The presence of a search
> warrant serves a high function.  Absent some grave emergency, the
> Fourth Amendment has interposed a magistrate between the citizen
> and the police.  This was done not to shield criminals nor to make
> the home a safe haven for illegal activities.  It was done so that an
> objective mind might weigh the need to invade that privacy in
> order to enforce the law.  The right of privacy was deemed too
> precious to entrust to the discretion of those whose job is the
> detection of crime and the arrest of criminals.  Power is a heady
> thing; and history shows that the police acting on their own cannot
> be trusted.  And so the Constitution requires a magistrate to pass
> on the desires of the police before they violate the privacy of the

> home. We cannot be true to that constitutional requirement and
> excuse the absence of a search warrant without a showing by those
> who seek exemption from the constitutional mandate that the
> exigencies of the situation made that course imperative.

McDonald v. United States, 335 U.S. 451, 455-56 (1948); see also Johnson v. United States, 333 U.S. 10, 13-14 (1948) ("The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. . . . The right of officers to thrust themselves into a home is . . . a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.").

Defendants contend that one recognized exception to this rule – the exigent-circumstances exception – justifies the warrantless entry here. See Dist. Mot. at 17-22. This exception authorizes the warrantless entry of premises where the police have "an urgent need or an immediate major crisis in the performance of duty affording neither time nor opportunity to apply to a magistrate" for a warrant. United States v. Johnson, 802 F.2d 1459, 1461 (D.C. Cir. 1986) (brackets, internal quotation marks, and citations omitted). For example, police "may make a warrantless entry onto private property . . . to prevent the imminent destruction of evidence, or to engage in hot pursuit of a fleeing suspect." Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (internal quotation marks and citations omitted). The officer must have a reasonable belief that exigent circumstances actually existed. See United States v. Goree, 365 F.3d 1086, 1090 (D.C. Cir. 2004).

Courts have consistently cautioned that the exigent-circumstances exception should be applied guardedly and "have recognized emergencies excusing failure to procure a warrant very sparingly."  United States v. Dawkins, 17 F.3d 399, 405 (D.C. Cir. 1994) (internal citations omitted); see also Dorman v. United States, 435 F.2d 385, 392 (D.C. Cir. 1970) ("[t]erms like 'exigent circumstances' or 'urgent need' are useful in underscoring the heavy burden on the police to show that there was a need that could not brook the delay incident to obtaining a warrant").  Mere inconvenience in delaying entry while seeking a warrant is clearly insufficient, as to allow the exigent-circumstances doctrine to be invoked without a heightened showing of need would "'allow[ ] the exception to swallow the rule.'"  United States v. Drummond, 98 F. Supp. 2d 44, 52 (D.D.C. 2000) (quoting Florida v. J.L., 529 U.S. 266, 273 (2000)) (discussing similar concerns with respect to implications of recognizing additional exceptions to knock-and-announce rule).

i.    Dorman Factors

Rather than "spell[ing] out a definition of 'exigency' with any precision," courts in this Circuit evaluate "several nonexclusive considerations pertinent to a finding of exigency." Dawkins, 17 F.3d at 405 (citing Dorman, 435 F.2d at 392-93).  The seven Dorman factors for determining the presence of exigent circumstances include:

> (1) [t]hat a grave offense is involved, particularly a crime of violence;
>
> (2) [that] the suspect is reasonably believed to be armed;
>
> (3) a clear showing of probable cause;
>
> (4) a strong reason to believe that the suspect is in the dwelling;
>
> (5) the likelihood of escape if not swiftly apprehended;
>
> (6) a peaceable entry as opposed to a "breaking"; and

(7) the time of entry (night or day).

United States v. Lindsay, 506 F.2d 166, 171 (D.C. Cir. 1974) (citing Dorman, 435 F.2d at 392-93).   In applying these factors, a court's analysis must "be shaped by the realities of the situation presented by the record."   United States v. Robinson, 533 F.2d 578, 581 (D.C. Cir. 1976).   These factors are to be applied to the facts as perceived by the police at the time of entry, not as subsequently uncovered.   Lindsay, 506 F.2d at 171.

The parties firmly dispute whether the circumstances here justify the officers' warrantless entry into Plaintiffs' apartment.   See Dist. Mot. at 17-22; Pls.' Am. Opp. to Dist. Mot. at 10-13. To resolve the dispute, the Court will address the salient Dorman factors, focusing on the gravity of the offense, the presence of a weapon, and the likelihood of escape.   Because the Court ultimately finds that Plaintiffs prevail here, its analysis will consider the facts in the light most favorable to the officers.

Defendants contend that the first factor – the gravity of the offense – supports the urgency of the officers' response.   See Dist. Mot. at 18.   Arriving on the scene of the assault, they observed Jasmine Sosa bleeding profusely from the face and called an ambulance to respond.   See Dist. Defs.' SUMF, ¶¶ 3-5, 8 (citing Depositions of Officers Liriano, Sarita, and Collado).   In speaking with Sosa and eyewitness Rosa Rivas, the officers learned that Sosa had been "jumped" by two ladies, who pushed her to the ground, kicking and punching her.   See id., ¶¶ 7-9 (citing Collado Dep.).   Officer Sarita believed that some type of object had been used in the assault due to the amount of blood he observed.   See id., ¶ 4 (citing Sarita Dep.).   The officers were then led by Rivas to the apartment where the alleged assailants lived.   See id., ¶¶ 15-16.

Even accepting the officers' account of the gravity of the injuries, the facts here essentially support a misdemeanor assault – conceivably, an assault with a dangerous weapon – and do not approach the level of violent crime that has justified exigency.  Compare Welsh v. Wisconsin, 466 U.S. 740, 752-53 (1984) (collecting cases where offenses are not sufficiently grave to  justify exigent circumstances), with United States v. McEachin, 670 F.2d 1139, 1144 n.7 (D.C. Cir. 1981) (robbery involving sawed-off shotgun sufficiently grave to support exigent circumstances); Robinson, 533 F.2d at 583 (armed car robbery sufficiently grave); United States v. Harris, 629 A.2d 481, 489 (D.C. 1993) (recognizing gravity of offense where "shooter had chosen a defenseless victim entirely at random," his "only motivation for the killing was that 'someone' had stolen the shooter's bicycle," he continued to threaten to "'shoot up all of Park Road until he got his bicycle back,'" and he "might well kill again if not apprehended"); Sturdivant v. United States, 551 A.2d 1338, 1341 (D.C. 1998) (grave offense where suspects had beaten one man and shot another with a sawed-off shotgun); United States v. Minick, 455 A.2d 874, 878 (D.C. 1983) (finding "offense obviously was a grave one," where suspect had sexually assaulted and strangled a woman to death); Brooks v. United States, 367 A.2d 1297, 1302 (D.C. 1976) (gravity of offense not challenged on appeal where victim had just been raped and was found by police disrobed and bleeding).

The officers' claim of exigency is further weakened by the second factor.  While they concede that there was no reason to suspect that any type of firearm had been used in the assault, they argue that this factor nonetheless tips "slightly" in their favor because two of the officers believed that some type of object had been employed in the fight.  See Dist. Mot. at 19; Dist. Defs.' SUMF, ¶ 4.  Even if they so believed, this "object" was not a knife or other inherently dangerous weapon.  The courts that have justified warrantless entries based in part on this factor

have focused on the heightened threat and risk that result from the presence of a weapon.  See,

e.g., Dawkins, 17 F.3d at 406 (collecting cases describing heightened exigency where deadly

weapons are present); United States v. Lindsey, 877 F.2d 777, 781 (9th Cir. 1989) (finding

exigency where police were provided with information that there were bombs in apartment);

McEachin, 670 F.2d at 1144 (recognizing "heightened" exigency in presence of deadly weapon);

United States v. McKinney, 477 F.2d 1184, 1186 (D.C. Cir. 1973) (presence of sawed-off

shotgun contributed to exigency); Harris, 629 A.2d at 490 (exigency where "police knew that the

shooter had been seen brandishing a 9-mm pistol and that no weapon had been recovered from

the murder scene"); United States v. Harris, 435 F.2d 74, 79 (D.C. Cir. 1970) (factor weighed in

favor of warrantless entry where officers believed robbers would be armed with the pistol that

had been used during earlier robbery and "[d]elay in arrest of an armed felon may well increase

danger to the community [], or to the officers at the time of arrest").  Here, exigency cannot be

justified by the conceivable use of an unknown blunt object, which every dwelling is assuredly

full of.

Additionally, while Dorman recognized that "the Fourth Amendment does not require

police officers to delay in the course of an investigation if to do so would gravely endanger their

lives or the lives of others," 435 F.2d at 392, Defendants provide no facts that would suggest that

the officers' lives – or the lives of any other individuals – were remotely in danger.  See, e.g.,

United States v. Moore, 91 F.3d 96, 98-99 (10th Cir. 1996) (finding no exigency where

government presented no evidence that officers were concerned for their safety); United States v.

Becker, 23 F.3d 1537, 1541 (9th Cir. 1994) ("[W]hile peril to officers . . . may well demonstrate

an exigency, mere unspecific fears about [this] possibilit[y] will not.").

The fifth factor further weighs against a finding of exigent circumstances. Courts have "taken an expansive view of the 'likelihood of escape' criterion," which under certain circumstances "includes consideration of the probability that evidence as well as the suspect may be lost." Derrington v. United States, 488 A.2d 1314, 1324 (D.C. 1985) (internal quotations omitted). Defendants here concede that "it was unlikely that the suspects would escape from the apartment, particularly if the officers arranged to have an officer stay at the door while the warrant was obtained." Dist. Mot. at 20. Nor have Defendants provided any evidence to suggest that a delay would have resulted in the loss of evidence or would have thwarted the investigation or their effort to ultimately arrest Plaintiffs. This factor, accordingly, does not support immediate action; instead, it suggests the officers should have proceeded through normal channels – even if doing so might have resulted in some delay.

The remaining Dorman factors cannot outweigh these principal ones. In other words, even assuming the officers had clear probable cause, believed the suspects were in the dwelling, and entered in a non-destructive manner during the day, such facts do not lead to a conclusion of exigency. In so holding, the Court is careful to view the facts as perceived by the officers as they were occurring – rather than with 20/20 hindsight. See, e.g., United States v. Rivera, 825 F.2d 152, 156 (7th Cir. 1987). Even when viewed in the light most favorable to the officers, however, the circumstances here do not create sufficient urgency to justify the warrantless entry.

ii.      Qualified Immunity

Having determined that the officers violated Plaintiffs' constitutional rights in entering the apartment without a warrant, the Court must decide whether the claim is nonetheless barred by qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or

16

constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The doctrine "gives government officials breathing room to make reasonable but mistaken judgments" and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

To show that a government official is not protected by qualified immunity, a plaintiff must establish (1) that the official's conduct violated the Constitution, and (2) that the constitutional right involved was sufficiently established such that a reasonable person would have known that his conduct violated the Constitution.  Pearson, 555 U.S. at 231 (citing Harlow, 457 U.S. at 818).  The officers' qualified-immunity argument hinges on the first prong of the analysis: whether they violated Plaintiffs' constitutional rights.  See Dist. Mot. at 17-22.  They do not argue that the right to be free from warrantless entries of the home was not clearly established or that the contours of the exigent-circumstances exception were not sufficiently developed.  See id.  The Court, however, has just found that Defendants' conduct here did violate the Constitution; thus qualified immunity offers no shield.

Because reasonable officers could not find that an after-school fistfight between two teenage girls (and one's mother) created sufficiently exigent circumstances under Dorman to justify a subsequent warrantless entry into the suspected assailants' apartment, the Court will grant Plaintiffs' Motion as to Count I(a) and deny Defendants'.  The Court notes, however, that the scope of damages available with respect to this claim may be quite limited.  As the Eighth Circuit concluded in Miller v. Albright, 657 F.3d 733 (8th Cir. 2011), a plaintiff must introduce evidence of actual damages resulting from the unlawful entry.  Id. at 738.  "[E]vidence of actual

damages resulting from [the plaintiff's] excessive force claim" "are not sufficient to show that [the plaintiff] suffered damages as a result of the officers' unlawful entry into his home" because "these two claims are separate and distinct." Id. In the absence of evidence of such damages, a zero-dollar verdict or nominal damages may be all that Plaintiffs are entitled to. See id.

b.     Improper Arrest

Both sides next contend that they are entitled to summary judgment on the unlawful-arrest component (Count I(b)) of the § 1983 claim. The officers maintain that, as a matter of law, they had probable cause for the arrests. See Dist. Mot. at 22-23. Plaintiffs do not appear to dispute that the officers had probable cause; instead, they assert that the arrests were unlawful because "there was [sic] no exigent circumstances that justified that entry into the apartment." Pls.' Am. Opp. to Dist. Mot. at 14. Curiously, neither side addresses the important factual distinctions between the arrests that occurred in the home and the one that occurred on the street. The Court will briefly discuss the facts with respect to the three arrests before applying the appropriate legal standards to each.

Upon arriving on 14th Street, the officers encountered a teenage girl, who appeared to have been the victim of a recent assault. Rosa Rivas, an eyewitness to the assault, informed them that another girl and her mother had struck the victim several times and pulled her hair. She also provided the officers with the names of the individuals who had been involved, as well as where they lived. See Pls.' Resp. to Dist. Defs.' SUMF, ¶¶ 2-5, 14-17. She then accompanied the officers to this location to find the assailants. See id., ¶¶ 15-16. After entry into the apartment, the officers arrested Brenda Garay and her daughter Jennifer before taking them outside of the building. See id., ¶¶ 25-26. Once they were outside, Rivas informed the officers that they had handcuffed the wrong daughter; it was Jessica Pineda – not Jennifer Garay – who

had been involved in the fight.  See id., ¶ 28.  As a consequence, the officers freed Jennifer and

arrested Jessica.  See id., ¶ 29.

i.      Warrantless Arrests in the Home

A warrantless arrest of a suspect in her home is not permissible absent exigent

circumstances or consent.  See Payton, 445 U.S. at 586-602; see also Buenrostro v. Collazo, 973

F.2d 39, 43 (1st Cir. 1992) ("A non-consensual, non-exigent, warrantless entry into a home to

effectuate an arrest transgresse[s] the Fourth Amendment, notwithstanding that probable cause

sufficient to justify the same arrest in a more public arena may have existed.") (citing Payton,

445 U.S. at 590); Hopkins v. Bonvicino, 573 F.3d 752, 773 (9th Cir. 2009) ("The Fourth

Amendment protects against warrantless arrest inside a person's home in the same fashion that it

protects against warrantless searches of the home, which is to say that police officers may not

execute a warrantless arrest in a home unless they have both probable cause and exigent

circumstances."); Bashir v. Rockdale Cnty., 445 F.3d 1323, 1328 (11th Cir. 2006) ("a

warrantless arrest in a home violates the Fourth Amendment unless the arresting officer had

probable cause to make the arrest and either consent to enter or exigent circumstances

demanding that the officer enter the home without a warrant") (emphasis in original) (citing Kirk

v. Louisiana, 536 U.S. 635, 638 (2002), and Payton, 445 U.S. at 590); United States v. Chapman,

902 F.2d 1331, 1333 (8th Cir. 1990).

Contrary to Defendants' assertions, probable cause alone is insufficient.  Bashir, 445 F.3d

at 1328 ("the existence of probable cause does not by itself validate a warrantless home arrest")

(citing Payton, 445 U.S. at 588-89); Thurmond-Green v. Hodges, 128 Fed. Appx. 551, 552 (8th

Cir. 2005) (where plaintiff was arrested "after officers had illegally entered his home . . . even if

the officers had probable cause to arrest him, a warrantless arrest would be unlawful absent exigent circumstances").

Because the Court has already determined as a matter of law that no exigent circumstances were present here, see Section III.A.1.a.i, *supra*, the warrantless arrests of Garay and Jennifer in their apartment were unlawful. Additionally, the officers are not entitled to qualified immunity here as this right has been clearly established. Indeed, in a decision dating back nearly three decades, the Eighth Circuit rejected an officer's argument that the right to be free from warrantless home arrests absent exigent circumstances was not clearly established, noting:

> When this arrest took place in April of 1983, United States v. Houle, 603 F.2d 1297 (8th Cir. 1979) and Payton were firmly entrenched legal guideposts, and had removed any doubt that the privacy of the home is paramount in weighing fourth amendment concerns. It should have been obvious that if the home is to be protected against warrantless arrests for felonies, as Payton established, the home should be even more sacrosanct from invasion for warrantless arrests for minor crimes, requiring a far greater showing of exigency than that alleged here.

Patzner v. Burkett, 779 F.2d 1363, 1370 (8th Cir. 1985); see also Bashir, 445 F.3d a t1331 (no qualified immunity for officers' warrantless arrest where there were no exigent circumstances as it was clearly established that such conduct violated Fourth Amendment).

The Court will thus grant Plaintiffs' Motion as to the warrantless home arrests of Brenda and Jennifer Garay.

ii.      Warrantless Arrest Outside of the Home

Unlike the arrests that occurred inside, Jessica's arrest took place on a public street. See Dist. Defs.' SUMF, ¶¶ 25, 28-29. Arrests that occur outside of the home do not require a showing of exigency, but they "must be predicated on particularized probable cause." Barham v.

Ramsey, 434 F.3d 565, 573 (D.C. Cir. 2006).  In determining whether probable cause exists, courts examine "the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."  Devenpeck v. Alford, 543 U.S. 146, 152 (2004).  "Probable cause exists where the arresting officer possesses information 'sufficient to warrant a prudent [person] in believing that the [suspect has] committed or [is] committing an offense."  United States v. Catlett, 97 F.3d 565, 573 (D.C. Cir. 1996) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)) (alterations in original); see also United States v. Jackson, 415 F.3d 88, 91 (D.C. Cir. 2005) (internal citations omitted); Bolger v. Dist. of Columbia, 608 F. Supp. 2d 10, 18 (D.D.C. 2009) (probable-cause inquiry is based on "'[the] totality of the circumstances,' which requires that 'the police had enough information to warrant a man of reasonable caution in the belief that a crime has been committed and that the person arrested has committed it'") (quoting Illinois v. Gates, 462 U.S. 213, 230 (1983); Barham, 434 F.3d at 572) (citation omitted).

It cannot be gainsaid that the officers had probable cause to arrest Jessica Pineda, even viewing the facts in the light most favorable to her.  After they had found the apparent victim of an assault on the street, an eyewitness informed them of the facts of the attack, the identities of the assailants, and where they could be apprehended.  See Dist. Defs.' SUMF, ¶ 14.  The witness then led the officers to where the suspects lived and identified Jessica as the daughter who had been involved in the fight.  See id., ¶¶ 16, 28.  Such information clearly constitutes probable cause.  See, e.g., McEachin, 670 F.2d at 1142-43 (probable cause where officer relied on testimony of eyewitnesses whose "information was based on direct, personal observation or first-hand knowledge"); Daniels v. United States, 393 F.2d 359, 361 (D.C. Cir. 1968) (probable cause for arrest where officer received information from an eyewitness who he reasonably believed was telling the truth).  As Defendants correctly note, the relevant facts here are those observed by

a reasonable officer at the time of the incident – not the facts that were understood by other individuals at the scene or facts that came to light at a later time.

Plaintiffs do not appear to dispute that the officers had probable cause; however, elsewhere in their brief they challenge Rivas's credibility.  See Pls.' Am. Opp. to Dist. Mot. at 12-13.  Specifically, they contend that "the information provided by Jasmine's friend Rosa was not credible.  As a friend of Jasmine, she was biased and would have reasons to misstate the facts that Jasmine had assaulted and provoked the confrontation between herself and Jessica."  Id. at 12.  Even if the relationship had been known to the officers, an inference unsupported by the record, this fact alone hardly defeats probable cause.  See, e.g., Ahlers v. Schebil, 188 F.3d 365, 370 (6th Cir. 1999) ("An eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation.  This comports with the general notion that, since eyewitnesses' statements are based on firsthand observations, they are generally entitled to a presumption of reliability and veracity.") (citation and internal quotation marks omitted).

Here, in addition to Rivas's eyewitness testimony, they directly observed Sosa's injuries and spoke with her about the altercation.  See Dist. Defs.' SUMF, ¶¶ 2-7.  The officers had no reason to believe that the eyewitness was lying or providing them with false information as to the individuals who had been involved in the incident or who had been the aggressor.  The Court thus holds as a matter of law that the officers had probable cause to arrest Jessica Pineda in front of the apartment building and will accordingly grant their Motion as to that daughter alone.

c.       Excessive Force

"The 'Fourth Amendment's freedom from unreasonable searches and seizures [also] encompasses the plain right to be free from the use of excessive force in the course of an arrest.'" Dormu v. Dist. of Columbia, 795 F. Supp. 2d 7, 18 (D.D.C. 2011) (quoting Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002)) (alteration in original).  Excessive-force claims are examined under the Fourth Amendment's reasonableness standard, which asks "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Scott v. Dist. of Columbia, 101 F.3d 748, 758 (D.C. Cir. 1996) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)).  "An officer will be found to have used excessive force only 'if the force used was so excessive that no reasonable officer could have believed in the lawfulness of his actions.'"  Oberwetter v. Hilliard, 680 F. Supp. 2d 152, 167 (D.D.C. 2010) (quoting Rogala v. Dist. of Columbia, 161 F.3d 44, 54 (D.C. Cir. 1998)), aff'd, 639 F.3d 545 (D.C. Cir. 2011).

"In general, police officers have authority to use 'some degree of physical coercion' when subduing a suspect, Graham v. Connor, 490 U.S. 386, 396 (1989), as long as the amount of force used is reasonable.  In Judge Friendly's famous formulation, 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'"  Oberwetter, 639 F.3d at 555 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)) (parallel citations omitted).  The reasonableness of the use of force must be determined based on "the facts and circumstances of [the] particular case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [s]he [wa]s actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396.

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 396-97.  For Plaintiffs to prevail, "the excessiveness of the force [must be] so apparent that no reasonable officer could have believed in the lawfulness of his actions." Wardlaw v. Pickett, 1 F.3d 1297, 1303 (D.C. Cir. 1993).

Because Defendants alone move for summary judgment on this claim, the Court will view the facts here in the light most favorable to Plaintiffs.  Additionally, as the use of force differs substantially for each Plaintiff, the Court will address the claims separately.

i.      Jennifer Garay and Jessica Pineda

Plaintiffs offer only vague allegations regarding the physical injuries experienced by the daughters in their interactions with the officers.  Specifically, they contend that while the "police did not beat [Jennifer] up . . . physical harm was done.  Here, the Defendant caused physical and emotional damages to the Plaintiffs.  All of the Plaintiffs[] suffered emotional and physical distress, and exhibited signs of depression, nervousness, lack of sleep, and loss of appetite." Pls.' Resp. to Dist. Defs.' SUMF, ¶ 26.  Such statements relate to the effects, not the cause. Plaintiffs, moreover, provide no specific cites to the record in support of their assertions that the daughters were physically harmed, instead citing generally "See Amended Complaint; Plaintiffs' Depositions." See id.  These citations are patently insufficient.  Allegations in a complaint are decidedly not evidence and cannot be relied on by the Court in ruling on this Motion. See Savage v. Scales, 310 F. Supp. 2d 122, 132 (D.D.C. 2004) (discussing Fed. R. Civ. P. 56(e) and its requirement that party opposing summary judgment set forth specific facts and not rely on "the bald allegations contained in its complaint") (internal citations omitted); see also Springer v.

Durflinger, 518 F.3d 479, 484 (7th Cir. 2008) ("summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events") (internal quotation marks omitted).  Nor is it this Court's obligation to dig through hundreds of pages of evidence in search of factual support for Plaintiffs' assertions, where they fail to direct the Court to specific facts in the record.  See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 151, 154 (D.C. Cir. 1996) ("Where a party fails to comply with Rule 56(e) or to file a proper statement of material facts in dispute pursuant to a local rule, the circuits are in agreement that the district court is under no obligation to sift through the record, which often contains voluminous deposition transcripts, interrogatory responses, and document productions, in order to evaluate the merits of that party's case."  Instead, the "burden [is] on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record.").

Despite Plaintiffs' failure to comply with these rules, the Court has nonetheless endeavored to review the deposition transcripts appended as exhibits to Plaintiffs' filings, and it has identified the following facts surrounding claims of force used during the arrests of Garay's daughters.  In Jennifer's deposition, she was asked whether the police had caused her any physical harm, and she responded that they had not.  See Pls.' Mot., Exh. 4 (Deposition of Jennifer Garay) at 80.  Additionally, while Jennifer noted that the officers "grabbed her [mother's] arms" and pulled her mother by the arms while walking out of the apartment, she again stated that she herself did not personally experience any physical injuries.  See id. at 80-82.  Similarly, in Jessica's deposition, she stated that she had witnessed the police put the handcuffs on her mother and sister; however, she went to another room in the apartment and "didn't see

anything [else]."  See Pls.' Mot., Exh. 3 (Deposition of Jessica Pineda) at 49-50.  Describing her

own interaction with the officers on the street in front of her apartment, she stated that she did

not feel that she had suffered a physical injury as a result of the incident.  See id. at 52, 69, 72.

There is thus no support in the record that either daughter was subjected to any force at

all – let alone excessive force – during the arrests.  Because handcuffing a suspect without more

does not constitute excessive force, see Cotton v. Dist. of Columbia, 541 F. Supp. 2d 195, 203-

04 (D.D.C. 2008), the Court will grant summary judgment to the officers on this claim as to

Garay's daughters.

ii.      Brenda Garay

While the record is devoid of evidence of any force applied to either of the daughters,

there are facts that support Garay's contention that some degree of force was employed by the

officers when arresting her:

> Plaintiff Brenda Garay testified that the officers grabbed her on
> both her arms in the area between her elbow and shoulder.  Exh. 6
> (B. Garay Dep. at 48-49).  Plaintiff Jessica Pineda said she
> observed the officers grab her mother roughly but only to handcuff
> her. Exh. 4 (J. Pineda Dep. at 125-126).  Plaintiff Brenda Garay
> stated that she sustained bruises to her wrist, both arms, an elbow,
> and a scrape on her foot as a result of the force used by the officers
> during the arrest. Exh. 6 (B. Garay Dep. at 69-70).

Dist. Defs.' SUMF, ¶ 27; see also Pls.' Opp. at 9 (citing no additional testimony regarding

force).

Even crediting Plaintiffs' accounts, the Court finds their averments insufficient to raise a

triable issue of fact as to the officers' use of force.  See, e.g., Steele v. Dist. of Columbia Housing

Auth., No. 02-1420, 2006 WL 335770, at *7 (D.D.C. Feb. 14, 2006) (finding that officers'

physical contact with suspect – spinning him around and pushing him against the wall – to be "a

typical maneuver in an arrest situation," which was justified by the facts); Robinson v. Dist. of

Columbia, No. 03-1455, 2006 WL 2714913, at *4 (D.D.C. Sept. 22, 2006) (concluding that

qualified immunity protected a police officer who "pushed plaintiff and shoved him onto the

hood of his car, and held [him] down while putting the handcuffs on [his] wrists . . . tightly

enough to cause swelling and abrasions, but [causing] no ongoing or permanent injury"); Gee v.

Dist. of Columbia, Nos. 04-1797, 2005 WL 3276272, at *3 (D.D.C. Aug. 22, 2005) (concluding

that qualified immunity protected a police officer who "took [the plaintiff's] right arm, and

twisted it behind [his] back" while another officer "took his hand and forcible [*sic*] bent [his]

neck forward causing injuries" to his back, neck, penis, arm, and head).

Garay's allegation that the officers grabbed her upper arm simply does not rise to the

level of conduct that courts in this Circuit and District have found sufficient to sustain a claim for

excessive force.  See, e.g., Rudder v. Williams, 666 F.3d 790, 795 (D.C. Cir. 2012) (plaintiff

alleged sufficient facts to support excessive-force claim where officers had struck her children

with a baton and then struck her with a baton for raising concerns about the force used against

her children); Mazloum v. Dist. of Columbia Metro. Police Dept., 522 F. Supp. 2d 24, 35

(D.D.C. 2007) (surviving summary judgment when facts viewed in light most favorable to

plaintiff showed "he was assaulted by the officers, repeatedly pushed and hit in the back,

dragged across the nightclub floor, and then thrown to the ground outside (not to mention the

more serious assault by [another defendant])"); Johnson v. Dist. of Columbia, 528 F.3d 969, 975

(D.C. Cir. 2008) (finding summary judgment premature where officers' repeated kicks to

suspect's groin could support a Fourth Amendment claim).

While there is no evidence that Garay was resisting arrest or acting aggressively towards

the officers, the grabbing here is akin to the sort of "push or shove" that the Supreme Court has

found insufficient to constitute excessive force.  See Graham, 490 U.S. at 396 (quoting Glick,

481 F.2d at 1033).  Because Plaintiffs' claim of unreasonable force fails as a matter of law, the

Court will grant the officers' Motion as to Count I(c).

Having finally covered the waterfront on all of the issues related to § 1983, the Court

may now examine the common-law claims asserted against the officers.

2.    *False Arrest and False Imprisonment*

Since "[t]here is 'no real difference as a practical matter between false arrest and false

imprisonment,'"  Barnhardt v. Dist. of Columbia, 723 F. Supp. 2d 197, 214 (D.D.C. 2010)

(quoting Shaw v. May Dep't Stores Co., 268 A.2d 607, 609 n.2 (D.C. 1970)); see also Gabrou v.

May Dep't Stores Co., 462 A.2d 1102, 1104 (D.C. 1983) ("In this jurisdiction, the gravamen of a

suit for false arrest or false imprisonment is an unlawful detention."), Count II for false arrest and

Count III for false imprisonment may be considered together.

For either claim, "[t]he focal point of the action is the question whether the arresting

officer was justified in ordering the arrest of the plaintiff; if so, the conduct of the arresting

officer is privileged and the action fails."  Scott, 101 F.3d at 754 (quoting Dellums v. Powell,

566 F.2d 167, 175 (D.C. Cir. 1977)); see also Enders v. Dist. of Columbia, 4 A.3d 457, 466-67

(D.C. 2010) (explaining that where a warrantless arrest requires probable cause and exigent

circumstances, an officer will have a defense for false arrest or false imprisonment only where he

can establish that the arrest was legally justified).  In Section III.A.1.b, *supra*, the Court

discussed the legality of the arrests of each Plaintiff and found that the only one that was justified

was that of Jessica Pineda outside of the home.  Accordingly, the Court will grant the officers'

Motion with respect to her claims under Counts II and III.  Because the arrest of neither Garay

was appropriate, however, their claims of false arrest and false imprisonment may proceed.  See

Section III.A.1.b, *supra*; see also Scott, 101 F.3d at 753 ("The elements of a constitutional claim

for false arrest are substantially identical to the elements of a common-law false arrest claim.").
The Court notes, nonetheless, that to the extent the harm alleged under these counts is identical
to that alleged in the § 1983 violation, Plaintiffs are not entitled to separate damages. See
Schiller v. Strangis, 540 F. Supp. 605, 624 (D. Mass. 1982).

### 3.    Intentional Infliction of Emotional Distress

"Under District of Columbia law, the tort of intentional infliction of emotional distress
requires (1) 'extreme and outrageous conduct' by the defendant that (2) 'intentionally or
recklessly' (3) causes the plaintiff 'severe emotional distress.'" Busby v. Capital One, N.A., No.
11-1172, 2013 WL 1191180, at *26 (D.D.C. March 25, 2013) (quoting Kotsch v. Dist. of
Columbia, 924 A.2d 1040, 1045 (D.C. 2007)); Sere v. Grp. Hospitalization, Inc., 443 A.2d 33,
37 (D.C. 1982) (citing Rest. 2d of Torts § 46).

"Whether conduct is 'extreme and outrageous' depends on 'applicable contemporary
community standards of offensiveness and decency, and [ ] the specific context in which the
conduct took place.'" Khan v. Parsons Global Servs., Ltd., 521 F.3d 421, 428-29 (D.C. Cir.
2008) (quoting King v. Kidd, 640 A.2d 656, 668 (D.C. 1993) (alteration in original)). In
assessing the conduct at issue, the Court must find it "so outrageous in character, and so extreme
in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and
utterly intolerable in a civilized community." Sere, 443 A.2d at 37.

Even assuming Plaintiffs can satisfy the first two elements of this cause of action – in
other words, even if an intentional Fourth Amendment violation is necessarily outrageous –
there are no facts in the record to support the final requirement that the "emotional distress [be]
of so acute a nature that harmful physical consequences might be not unlikely to result." Kotsch,
924 A.2d at 1046 (internal quotation marks and citation omitted). "Recovery is not allowed

merely because conduct causes mental distress."  <u>Crowley v. North Am. Telecomms. Ass'n</u>, 691

A.2d 1169, 1172 (D.C. 1997).  Likewise, "'[e]mbarrassment and difficulty' do not approach the

level of foreseeable harm essential to establish [] intentional tort liability."  <u>Waldon v. Covington</u>,

415 A.2d 1070, 1078 (D.C. 1980).

Plaintiffs maintain that "[a]ll of the Plaintiffs' suffered emotional and physical distress,

and exhibited signs of depression, nervousness, lack of sleep, and loss of appetite."  <u>See</u> Pls.'

Resp. to Dist. Defs.' SUMF, ¶ 26.  Jennifer Garay described the incident as making her "sad and

mad and angry"; she "cried twice about the incident, and she felt angry when she saw the officers

after the incident," and "she had trouble sleeping and felt nervous."  <u>See</u> Dist. SUMF, ¶ 34.

Jessica Pineda stated that she was "anxious and depressed after the incident," but "did not talk to

any doctors or counselors or anyone at school about the incident, and did not miss any school

due to the incident."  <u>See id.</u>, ¶ 35.  Brenda Garay "described the incident as a 'nightmare' that

she could not forget, and suffered mental injuries because she 'thought the police were here to

help you, but not to take you out by force and use violence.'  She further stated that she did not

see a therapist or any other professional regarding any mental distress she felt."  <u>Id.</u>, ¶ 36.

Even when viewed in the light most favorable to Plaintiffs, these facts provide no

indication that their distress was "of so acute a nature that harmful physical consequences might

be not unlikely to result."  <u>Kotsch</u>, 924 A.2d at 1046 (internal quotation marks and citation

omitted); <u>see also</u> <u>Wood v. Neuman</u>, 979 A.2d 64, 78 (D.C. 2009) (plaintiff who was "'horrified'

at [the] destruction of her garden, was constantly crying and almost sleepless, was shaken . . .

and embarrassed at having been made out to be a 'pariah' in the neighborhood" denied recovery

because distress was insufficiently severe); <u>Bakeir v. Capital City Mortg. Corp.</u>, No. 90-2202,

2013 WL 782612, at *16 (D.D.C. March 4, 2013) (where "evidence shows only that the plaintiff

experienced general distress, embarrassment, and unhappiness," "plaintiff did not present evidence that she suffered emotional distress 'so acute that harmful physical consequences might result'"); <u>Lyles v. Micenko</u>, 468 F. Supp. 2d 68, 75 (D.D.C. 2006) (plaintiffs' claim of "severe emotional distress" was unsupported by record evidence and even when viewed in the light most favorable to her, record did "not establish by sufficient admissible evidence that a reasonable trier of fact could find for the nonmovant on the existence of [the third] element of the [IIED] claim); <u>Kalantar v. Lufthansa German Airlines</u>,  402 F. Supp. 2d 130, 146 (D.D.C. 2005) (applying Virginia law and finding plaintiff failed to satisfy "severity" element of IIED claim where his deposition testimony was unsubstantiated by "objectively verifiable evidence") (citation and internal quotation omitted); <u>Brewton v. City of New York</u>, 550 F. Supp. 2d 355, 369 (E.D.N.Y. 2008) ("Emotional distress is severe when it is of such intensity and duration that no reasonable person should be expected to endure it."); <u>Hill v. Macon Police Dep't</u>, No. 10-472, 2013 WL 594200, at *14 (M.D. Ga. Feb. 15, 2013) (applying Georgia's similar standard for IIED and noting, "[E]motional distress includes all highly unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea.  It is only where it is extreme that liability arises.  The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it.") (alteration in original; internal citation omitted).

The Court, accordingly, grants Defendants' Motion as to Count IV.

### 4.    *Invasion of Privacy*

"Invasion of privacy is not one tort, but a complex of four, each with distinct elements and each describing a separate interest capable of being invaded.  The four constituent torts are (1) intrusion upon one's solitude or seclusion; (2) public disclosure of private facts; (3) publicity

that places one in a false light in the public eye; and (4) appropriating one's name or likeness for another's benefit."  Wolf v. Regardie, 553 A.2d 1213, 1216-17 (D.C. 1989) (citation omitted). Plaintiffs' claims here relate to the first constituent tort.  The tort of intrusion upon seclusion has three elements: "(1) an invasion or interference by physical intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination; (2) into a place where the plaintiff has secluded himself, or into his private or secret concerns; (3) that would be highly offensive to an ordinary, reasonable person."  Id. at 1217 (internal citations omitted).

It is clear that the first two prongs are satisfied here – namely, that there was a physical intrusion when the officers improperly entered Garay's apartment and that Plaintiffs had secluded themselves in their home.  The third prong is the acid test: was the warrantless entry into Plaintiffs' home in violation of the Fourth Amendment highly offensive to an ordinary, reasonable person?

Although District of Columbia courts have yet to address whether such a warrantless entry would satisfy this element of the intrusion-upon-seclusion tort, other courts have recognized similar claims.  The Kansas Supreme Court, for example, found that a sheriff and his surety could be liable for invasion of privacy where police officers entered the plaintiff's home without a warrant in search of a suspect in an attempted robbery that had recently occurred.  See Monroe v. Darr, 559 P.2d 322, 327 (Kan. 1977) ("It was undisputed that the sheriff's deputies physically intruded upon the seclusion of the plaintiff Monroe.  Such intrusion, unless justified by the circumstances, would constitute an actionable invasion of Monroe's right of privacy.") (citations omitted); see also Thompson v. City of Jacksonville, 130 So. 2d 105, 108 (Fla. Dist. Ct. App. 1961) (plaintiff had sufficiently alleged invasion of privacy to survive motion to dismiss

where police offers entered and searched bedroom in dwelling house where she resided); Mauri

v. Smith, 929 P.2d 307, 311-312 (Or. 1996) (reversing directed verdict for defendant officers

where there was evidence for each of three elements of tort of intrusion upon seclusion from

which a jury reasonably could have found in plaintiffs' favor where officers entered plaintiffs'

living room without consent); Berg v. United States, No. 03-4642, 2007 WL 425448, at *8 (D.

Minn. Feb. 2, 2007) (denying summary judgment on intrusion-upon-seclusion claim where

factual issues remained and noting that if plaintiff "is able to prove that there was a violation of

her Fourth Amendment rights, then the intrusion element would be established because she will

have established a violation of her legitimate expectation of privacy in her luggage.  Moreover, it

is axiomatic that any constitutional violation is highly offensive.  Thus, if an intrusion is

established, that intrusion was highly offensive and a violation of [plaintiff's] legitimate

expectation of privacy.").

        The Court, therefore, cannot grant summary judgment to the officers on this count.

Similarly, any qualified-immunity argument on this count is foreclosed by the prior analysis.

See Section III.A.1.a.ii, *supra*.

        *5.    Trespass*

        The D.C. Circuit has held that "[t]he tort of trespass in the District of Columbia is the

intentional intrusion of a person or thing upon property that invades and disrupts the owner's

exclusive possession of that property."  Morgan v. Barry, 12 Fed. Appx. 1, 3 (D.C. Cir. 2000)

(citation and internal quotation marks omitted).  More specifically, it is "simply an unauthorized

entry by one person upon the land of another."  Id. (citation omitted).  Defendants contend that

"because probable cause exists and the warrantless entry was not objectively unreasonable, the

officers' entry into the apartment cannot constitute trespass."  See Dist. Mot. at 32.

Defendants are correct that where officers lawfully enter a house, the entry will not constitute a trespass.  See, e.g., Trull v. Smolka, 411 Fed. Appx. 651, 657 (4th Cir. 2011) ("if the entry on the property was authorized by law, then the claim for trespass cannot be successful"); Tensley v. City of Spokane, 267 Fed. Appx. 558, 560 (9th Cir. 2008) (plaintiff's trespass action failed where officers entered his property pursuant to valid search warrant); Hicks v. City of Buffalo, 124 Fed. Appx. 20, 25 (2d Cir. 2004) (where warrantless search of premises was justified by exigent circumstances, defendants entitled to summary judgment on plaintiff's trespass claim).

This protection, however, does not extend to unlawful entries: "Law enforcement officers who enter premises without authority are subject to common law trespass actions."  Turner v. Sheriff of Marion Cnty., 94 F. Supp. 2d 966, 984 (S.D. Ind. 2000); see also Levine v. City of Bothell, No. 11-1280, 2012 WL 5248760, at *7 (W.D. Wash. Oct. 24, 2012) (plaintiff's trespass claims against law-enforcement officers survived summary judgment where question existed as to whether officers had entered under a valid search warrant); Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1240 (D.N.M. 2012) (denying qualified immunity for trespass claims where there was evidence that officers entered plaintiff's home without a warrant and without an exception to warrant requirement); Cole v. City of Sunnyvale, No. 08-5017, 2011 WL 4346510, at *10 (N.D. Cal. Sept. 14, 2011) (plaintiffs' trespass claim could proceed where officers entered residence without a warrant to search for weapons, and search was not justified under any exception to warrant requirement); Arbuckle v. City of Chattanooga, 696 F. Supp. 2d 907, 931 (E.D. Tenn. 2010) (plaintiff's trespass claim survives summary judgment where question existed as to lawfulness of officers' entry into her home); Powell v. Nunley, 682 F. Supp. 2d 1260, 1272-73 (W.D. Okla. 2010) (denying officers' motion for summary judgment on

trespass claim where officers had a warrant, but entered wrong house); Modrell v. Hayden, 636

F. Supp. 2d 545, 561 (W.D. Ky. 2009) (where exigent circumstances did not exist to justify

defendant's entry into plaintiff's residence, his claim of trespass could proceed).

Having found the officers' entry here to be unlawful, see Section III.A.1.a, *supra*, the

Court will deny their Motion as to the trespass claim and on qualified immunity.  See Section

III.A.1.a.ii, *supra*.  The Court, however, reiterates its caveat on damages resulting from the entry

alone.  See id.

B.  Wilson and Van Metre

Having disposed of all issues related to the District Defendants, the Court now turns to

the claims against the building and its property manager.  In Garay I, this Court previously

dismissed the § 1983 claim against Wilson (Count I) and the IIED claim (Count IV) against both

Wilson and Van Metre.  See 839 F. Supp. 2d at 144.  The only counts that remain are trespass

(Count VIII) and invasion of privacy (Count VII).  In considering these two, the Court finds that

Wilson is entitled to summary judgment on both and thus will grant her Motion.  Since the

claims against Van Metre are based on *respondeat superior*, Wilson's lack of liability frees her

employer as well.

1.    *Trespass*

As discussed in Section III.A.5, *supra*, "The tort of trespass in the District of Columbia is

the intentional intrusion of a person or thing upon property that invades and disrupts the owner's

exclusive possession of that property."  Morgan, 12 Fed. Appx. at 3.  Defendants Wilson and

Van Metre contend that they are entitled to summary judgment on this claim because Brenda

Garay consented to Wilson's entry into the apartment in the terms of her lease.  See Wilson Mot.

at 8-10.  The Court agrees.

As the Court rules here against Plaintiffs, it will consider the facts in the light most favorable to them.  On July 5, 2006, Garay applied to lease an apartment located at 1375 Fairmont Street, Northwest.  See Wilson Statement of Undisputed Material Facts (Wilson SUMF), ¶ 1.  Garay's application was approved, and she entered into a lease with New Amsterdam Associates, LLC for Apartment 301.  See id., ¶  6.  Defendant Van Metre Uptown Apartments, LLC subsequently purchased the property and acquired New Amsterdam's landlord interest in the apartment.  See id., ¶ 8.

Garay's lease agreement included several provisions relevant to the claims here, including a "Right of Inspection and Entry."  See Wilson Mot., Exh. C (Lease Agreement), ¶ 11. This provision permits the

> Landlord, its agent, employees, contractors or subcontractors to have access to said premises at any time for the purpose of inspection or in the event of fire, accident or other property damage to repair, or for the purpose of installation, servicing, or removal of Landlord's equipment, or for the purpose of making any repairs and/or replacements Landlord considers necessary or desirable.  The Landlord may retain duplicate keys to all the doors of the Leased Premises.  THE LANDLORD SHALL HAVE THE RIGHT DURING THE LAST 30 DAYS OF THE TERM HEREIN CREATED TO SHOW THE LEASED PREMISES TO PROSPECTIVE TENANTS.

Id.  The Agreement contains additional provisions regarding limitations on use of the premises for unlawful purposes, including

> NOT TO SUFFER UNLAWFUL USE AND TO COMPLIANCE WITH GOVERNMENT REGULATIONS – The Tenant shall not use or permit to be used, the Leased Premises for any unlawful purpose, or do or permit any unlawful act in or upon the Leased Premises. . . .  Tenant expressly agrees to be responsible for the action of his family and guest and stipulates that a breach of the lease by a family member or guest shall constitute a breach by Tenant.

Id., ¶ 6; see also Lease Addendum, ¶¶ 1, 3, 5 ("Resident, any member of the resident's

household, or a guest or other person under the resident's control shall not engage in criminal

activity . . . on or near property premises," and "[r]esident or members of the household will not

permit the dwelling unit to be used for, or to facilitate, criminal activity . . . whether the

individual engaging in such activity is a member of the household or a guest," and "[r]esident,

any member of the resident's household, or a guest or other person under the resident's control

shall not engage in acts of violence or threats of violence . . . on or near property premises.")

(emphasis in original).  While neither party questions that these are the terms of the agreement,

see Pls.' Response to Wilson SUMF, ¶ 13, Plaintiffs dispute their applicability to the facts here.

Following the altercation on 14th Street, the officers sought to enter Garay's apartment,

but were denied permission.  See Wilson SUMF, ¶¶ 20-21.  At some point thereafter they

encountered Wilson and requested that she provide them with access to the unit.  See id., ¶ 22.

Wilson initially told them that she could not open the door without a warrant, but after some

back and forth with the officers, she ultimately unlocked the door for them.  See id., ¶¶ 23-24.

The parties dispute the extent of Wilson's subsequent involvement.  Defendants contend that

"she never physically entered The Apartment; she simply stood outside to observe and unsure

[sic] that it was not damaged."  See id., ¶ 25.  Plaintiffs, on the other hand, offer evidence that

she "leaned against the frame of the door while the officers placed plaintiffs' [sic] under arrest.

As she was standing by the door of the apartment in handcuffs, Ms. Garay tried to close the door

with her foot.  But Ms. Wilson prevented her from closing the door by pushing it open."  See

Pls.' Resp. to Wilson SUMF, ¶ 25 (citing Garay Affidavit, Garay Dep., and Pineda Dep.); see

also id., ¶ 26.  For purposes of the Motion, the Court must credit Plaintiffs' testimony and

assume Wilson actually entered the apartment.

As a result, Plaintiffs' trespass claim depends on whether Wilson's action was an unauthorized invasion of Garay's apartment or an entry permitted by the terms of the lease. Where the language in a lease is unambiguous, "its interpretation is a question of law for the court." Saul Subsidiary II Ltd. P'ship v. Venator Grp. Specialty, Inc., 830 A.2d 854, 861 (D.C. 2003) (internal citations omitted). In Sobelsohn v. Am. Rental Mgmt. Co., 926 A.2d 713 (D.C. 2007), the D.C. Court of Appeals grappled with a similar question, ultimately holding that the tenant was entitled to a new trial where the court below had failed to determine whether the landlord's actions constituted a trespass with respect to the tenant's possessory interest in his roof deck or if his actions were authorized by the lease. See id. at 719. On remand, it directed the trial court to determine whether the landlord's intrusions were authorized by "express or implied terms of the leasehold arrangement." Id. at 717-18.

Here, the scope of Wilson's right of entry under the terms of the lease is hotly contested. Defendants contend that it was authorized by the inspection provision and two other provisions relating to criminal activity. See Wilson Mot. at 8-10. Plaintiffs respond that the inspection clause does not provide for this sort of entry and that D.C. Municipal Housing Regulations require landlords to notify tenants in writing of the date and time of any inspection. See Pls.' Am. Opp. to Wilson Mot. at 2-3. The Court finds that the lease is not ambiguous and that Defendants' interpretation prevails.

The language in the inspection provision creates a broad right of inspection and entry, and it is not limited to a right to enter and make improvements or repairs, or to show the apartment to prospective tenants. See Lease Agreement, ¶ 11. In addition, the other provisions of the Lease and the Addendum prohibit violence or criminal behavior on or near the premises and use of the unit to facilitate criminal activity. Here, Wilson had learned of violent, criminal

behavior by Garay near the premises and that she was using the unit to facilitate her criminal activity by hiding there to avoid arrest. Indeed, police officers were seeking Wilson's aid. In such a circumstance, it was within the right of inspection for her to access the apartment to ensure that it was not being used to facilitate further criminal activity.

Finally, Plaintiffs' citation to the D.C. Municipal Housing Regulations is of no moment: the regulation they cite to, 14 D.C. Mun. Regs. tit. 14, § 310 (2012), concerns the return of security deposits. It thus has no relation to the facts here or Defendants' legal theory, which relies on the terms of the lease itself. The Court will thus dismiss Count VIII as to both Wilson and Van Metre.

2.     *Invasion of Privacy*

The Court previously set forth the different types of invasion of privacy and mentioned intrusion upon seclusion. See Section III.B.4, *supra*. To repeat, the tort of intrusion upon seclusion has three elements: "(1) an invasion or interference by physical intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination; (2) into a place where the plaintiff has secluded himself, or into his private or secret concerns; (3) that would be highly offensive to an ordinary, reasonable person." Wolf, 553 A.2d at 1217 (citations omitted).

Defendants contend that they are entitled to summary judgment on this claim because Wilson was authorized to open the apartment door and, moreover, her witnessing the officers arrest Plaintiffs from the hallway outside of the apartment was not highly offensive. See Wilson Mot. at 13-17. Plaintiffs respond that Wilson's actions were improper, were meant to harass and embarrass them, were highly offensive to a reasonable person, and resulted in emotional and physical damages. See Pls.' Am. Opp. to Wilson Mot. at 7-12. Because the Court has found that

Wilson was authorized to unlock the apartment under the lease's right of inspection, see Section III.B.1, *supra*, it need not consider the offensiveness question in ruling for Defendants.

While "District of Columbia case law has not defined the precise parameters of the tort," the "court in Wolf suggested some of the circumstances in which the tort of intrusion upon seclusion could arise, including harassment, peeping through windows, eavesdropping on private conversations, entering a person's home without permission, or secretly searching a person's belongings." Helton v. United States, 191 F. Supp. 2d 179, 181 (D.D.C. 2002) (citing Wolf, 553 A.2d at 1217-18). A landlord entering a leased unit in a building pursuant to terms within the rental agreement to inspect for criminal activity does not qualify as a cognizable intrusion upon Plaintiffs' seclusion. Courts elsewhere agree. See Allen v. McKenna Prop. Mgmt., LLC, No. 11-1946, 2012 WL 3648852, at *3 (D. Nev. Aug. 22, 2012) (dismissing plaintiff's intrusion-upon-seclusion claim where landlord conducted property inspections in accordance with lease); Williams v. Gene B. Glick Co., Inc., No. 09-113, 2012 WL 2458604, at *5 (S.D. Ind. June 27, 2012) (granting summary judgment for defendants on intrusion-upon-seclusion claim where inspection conducted pursuant to lease agreement).

Wilson is entitled to summary judgment on this count as well, meaning she may be dismissed from the case, as may Van Metre, whose liability is entirely vicarious.

## IV.   Conclusion

For the foregoing reasons, the Court will grant in part and deny in part the District Defendants' Motion and Plaintiffs' Motion, and will grant Wilson/Van Metre's Motion.

To recap the particulars, the Court will grant the District Defendants' Motion with respect to all claims against the District itself, as well as the following claims against the officers:

- Count I(b) only as to the arrest of Jessica Pineda;

- Count I(c) for excessive force as to all Plaintiffs;

- Counts II & III for false arrest and false imprisonment as to Jessica Pineda only;

- Count IV for intentional infliction of emotional distress as to all Plaintiffs; and

- Count V for malicious prosecution as to all Plaintiffs.

The Court grants Plaintiffs' Motion with respect to:

- Count I(a) for unlawful entry as to all Plaintiffs; and

- Count I(b) for the unlawful arrests of Brenda Garay and Jennifer Garay only.

The Court grants Wilson/Van Metre's Motion with respect to all remaining causes of action against them – namely, the invasion-of-privacy (Count VII) and trespass (Count VIII) claims.

The following causes of action remain, all of which are asserted against the officers only:

- Count I(d) and (e) for search without probable cause and preparation of false and/or incomplete police reports;

- Counts II & III for false arrest and false imprisonment as to Brenda and Jennifer Garay;

- Count VII for invasion of privacy; and

- Count VIII for trespass.

A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  May 3, 2013